IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JUNE 1997 SESSION

FILED

November 10, 1997

Cecil W. Crowson
Appellate Court Clerk

STATE OF TENNESSEE,           )
                              )
            APPELLEE,         )
                              )   No. 01-C-01-9608-CR-00357
                              )
                              )   Davidson County
                              )
v.                            )   Seth Norman, Judge
                              )
                              )   (Second Degree Murder)
                              )
                              )
PATRICK V. KELFALLA,          )
                              )
            APPELLANT.        )


FOR THE APPELLANT:                  FOR THE APPELLEE:

Jeffrey A. DeVasher                 John Knox Walkup
Assistant Public Defender           Attorney General & Reporter
1202 Stahlman Building              500 Charlotte Avenue
Nashville, TN 37201-5730            Nashville, TN 37243-0497

David M. Siegel                     Peter M. Coughlan
Assistant Public Defender           Assistant Attorney General
1202 Stahlman Building              450 James Robertson Parkway
Nashville, TN 37201-5730            Nashville, TN 37243-0493

Ralph W. Newman                     Victor S. Johnson III
Assistant Public Defender           District Attorney General
1202 Stahlman Building              222 Second Avenue, Suite 500
Nashville, TN 37201-5730            Nashville, TN 37201-1649

                                    Kymberly Haas
                                    Assistant District Attorney General
                                    222 Second Avenue, Suite 500
                                    Nashville, TN 37201-1649



OPINION FILED:_____

REVERSED AND REMANDED FOR A NEW TRIAL

Joe B. Jones, Presiding Judge

# OPINION

The appellant, Patrick V. Kelfalla (defendant), was convicted of second degree murder, a Class A felony, by a jury of his peers. The trial court found the defendant was a standard offender and imposed a Range I sentence of fifteen (15) years in the Department of Correction. In this Court the defendant contends (a) the evidence is insufficient to support his conviction and (b) the trial court abused its discretion in permitting improper rebuttal testimony. After a thorough review of the record, the briefs submitted by the parties, and the law governing the issues presented for review, it is the opinion of this Court that the judgment of the trial court should be reversed.

The victim, Timothy Gibson, had harassed the defendant on several occasions. In April of 1994, the victim told the defendant to "go back to Africa and swing the trees like a monkey" after losing a basketball game to the defendant. The victim then pulled a gun out of his pocket and waved it at the defendant. In May of 1994, the victim robbed the defendant, taking his paycheck from Captain D's restaurant and ten dollars. Also in May of 1994, the victim confronted the defendant while he was walking with Ronald Petway. The victim said, "every time I see you when you got some money in your pocket, I'm going to keep it." The victim then reached into the defendant's pocket and took five dollars. Later that month, the victim chased the defendant with a gun until he ran into a Krystal restaurant. The defendant spoke with the police about the incident but did not reveal the identity of the person who chased him.

On May 27, 1994, the defendant and the victim had an argument in the parking lot of the Woodhaven Apartments. The victim confronted the defendant in front of several onlookers about "snitching" on him to the police, saying "if you don't stay out of my business, I'm going to kill you before I go to jail." The victim pulled a gun on the defendant during this altercation. The defendant was also in possession of a revolver which he had obtained from his friend, Mario, a few moments before the confrontation.

Approximately thirty minutes into the argument, the victim returned to his apartment

and put away his gun.[1]   The victim then went outside the apartment and began arguing with the defendant again.  The victim's sister, Vanessa Sharpton, arrived at the apartment complex and encouraged her brother to withdraw from the argument.

The victim withdrew from the argument and rode away from the scene on a bicycle, stating that he was going to the store to purchase beer.  The defendant went across the street to Marcus Johnson's apartment in Terrace Hills with Marcus Johnson and two other friends, where he cried over the incident.

The defendant left Johnson's apartment between twenty minutes to an hour later, cutting  across the Woodhaven Apartment parking lot to go play basketball at the apartment complex.  The victim returned, unarmed, to the parking lot on his bicycle.  The defendant contends the victim began to push and threaten him while straddling the bicycle, and then told the defendant to come closer to him.  The defendant contends the victim said, "I ain't through with you yet.  Don't forget I'm -- kill you before I go to jail" and reached behind his back.  The defendant then shot the victim four times while moving towards the victim.[2]   The victim  fell to the ground with his bicycle still between his legs.  Eyewitnesses contend the defendant continued to shoot the victim after he fell to the ground.  The defendant stopped shooting when the back tire of the bicycle fell onto his feet.  The victim died within a few minutes of being shot.

The victim suffered gunshot wounds to the left back side of his head, the left side of his jaw, the bicep of his right forearm, and his back.  The victim also suffered a contemporaneous head contusion consistent with hitting his head on the pavement when he fell to the ground.  The pathologist testified that the gun was at least two feet from the victim when it was fired.  The pathologist testified the victim received the wounds from three different directions.  This could have been the result of the victim moving while he was being shot.  The wounds could also have been received in this manner if the victim had fallen face down to the ground before the final shots were fired.  The right arm was

---

[1]The defendant contends the victim did not return his gun to his apartment during the argument.  He also  states the victim actually held the gun to his head during the altercation.

[2]Eyewitnesses contend the defendant was three to four car lengths from the victim when he began shooting and that he did not start moving towards the victim until after the initial shots were fired.

extended away from the body at the time it was shot, but the pathologist was unable to conclusively determine exactly how the arm was extended at the time of the shooting since this bullet exited the body and was not subsequently recovered. The cause of death was multiple gunshot wounds.

The defendant fled to New York City, where he disposed of the murder weapon by throwing it off the Brooklyn Bridge. Once arrested, extradition proceedings were begun to return the defendant to Tennessee. However, the defendant eventually agreed to be extradited.

## I.

The defendant contends the evidence is insufficient, as a matter of law, to support a finding by a rational trier of fact that he was guilty of murder in the second degree beyond a reasonable doubt. He argues he acted in self-defense. In the alternative, he claims the evidence establishes he was guilty at most of voluntary manslaughter.

## A.

When an accused challenges the sufficiency of the convicting evidence, this Court must review the record to determine if the evidence adduced at trial is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App.), per. app. denied (Tenn. 1990).

In determining the sufficiency of the convicting evidence, this Court does not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App.), per. app. denied (Tenn. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859, cert. denied, 352 U.S. 845, 77 S.Ct. 39, 1 L.Ed.2d 49 (1956). To the contrary, this Court is required to afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and

4

legitimate inferences which may be drawn from the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not this Court. Cabbage, 571 S.W.2d at 835. In State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973), our Supreme Court said: "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."

Since a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused, as the appellant, has the burden in this Court of illustrating why the evidence is insufficient to support the verdicts returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the facts contained in the record are insufficient, as a matter of law, for a rational trier of fact to find that the accused is guilty beyond a reasonable doubt. Tuggle, 639 S.W.2d at 914.

## B.

The offense of murder in the second degree is defined by statute as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Before the defendant could be convicted of murder in the second degree, the State of Tennessee was required to establish beyond a reasonable doubt the defendant (a) unlawfully killed Gibson and (b) did so knowingly. Tenn. Code Ann. § 39-13-201(a) and 210(a)(1). The record establishes both elements of this offense.

The defendant admitted returning to Woodhaven Apartments with a gun at least twenty minutes after he and the victim had an argument outside the complex. The defendant admitted that when the victim returned to the area on a bicycle he no longer appeared to be in possession of a gun. The defendant began firing his gun at the victim after he claimed to see the victim reach behind his back. The defendant moved towards the victim, firing the gun until the tire of the bicycle the victim was straddling fell onto the

5

defendant's feet. The victim died within a few minutes of being shot. The defendant fled to New York City, where he disposed of the gun by throwing it off the Brooklyn Bridge. While there was evidence the defendant killed the victim in self-defense, it is obvious the jury did not believe the statements given by the defendant. As previously stated, the resolution of conflicting evidence is for the jury, not this Court. The jury saw the witnesses, observed their demeanor, assessed their credibility, and concluded that the defendant did not act in self-defense or in the heat of passion.

There is sufficient evidence to support a finding by a rational trier of fact the defendant was guilty of murdering Gibson in the second degree beyond a reasonable doubt. Tenn. R. App. 13(e).

This issue is without merit.

## II.

The defendant next contends the trial court erred by denying his motion to strike, or in the alternative, for a mistrial, following the introduction of improper rebuttal testimony by the state.

## A.

The defendant testified that at the time of the shooting the victim began pushing him and told the defendant to come closer. The defendant stated he began to walk slowly towards the victim, then proceeded at a faster pace when the victim told the defendant to move faster. The defendant indicated he kept the gun in his pocket while he walked towards the victim.

The state called Judy Brundige as a rebuttal witness. Ms. Brundige testified she was a passenger in the car of Mr. Sprague, the state's first eyewitness, when she witnessed the shooting. Ms. Brundige stated she heard two "pops" and noticed the victim immobile on the ground with a bicycle between his legs. Ms. Brundige then told jurors she saw a black male run towards the victim from three to four car lengths away and shoot a

6

gun at the victim three times.

Ms. Brundige's name did not appear in the police reports or in the assistant district attorney general's notes. The first encounter between the assistant district attorney general and Ms. Brundige occurred when the assistant district attorney general interviewed Mr. Sprague who was driving the motor vehicle in which Ms. Brundige was a passenger. The assistant district attorney general stated Sprague dominated the interview. Ms. Brundige became emotional during the interview. The assistant district attorney general decided to use Sprague as a witness. It was also decided Ms. Brundige would not be called as a witness notwithstanding the fact she had an unobstructed view of the murder as the events unfolded. The events leading to the murder occurred on the passenger side of Sprague's vehicle. The state did not subpoena Ms. Brundige as a witness.

Prior to trial, defense counsel inquired about the witnesses known to the state. The assistant district attorney general advised defense counsel about a woman who was riding in Sprague's vehicle when the murder occurred. She also told counsel that "I couldn't tell what she [Brundige] saw and what she didn't see."

Ms. Brundige appeared at the trial. She sat outside the courtroom during the entire trial because she felt a "kinship" with the victim's family. The assistant district attorney general spoke with Ms. Brundige during the morning hours of the second day of the trial. It was during this conversation the assistant district attorney general learned the defendant ran, not walked, towards the victim as he fired the pistol at the victim. This information was obtained "hours" before the defendant testified in support of his defense.

When the assistant district attorney general received this information, the state was presenting its evidence in chief. However, the assistant district attorney general opted not to call Ms. Brundige before resting the state's case-in-chief prior to the noon break. Furthermore, the assistant district attorney general did not tell defense counsel of Ms. Brundige's presence at the trial, she was available and could be interviewed, or the nature of her testimony until after the defendant had rested. This revelation was made immediately before Ms. Brundige was called as a rebuttal witness.

The assistant district attorney general stated she did not decide to call Ms. Brundige as a rebuttal witness until the defendant testified he was walking, not running, toward the

7

victim after the victim directed the defendant to approach him. As the assistant district attorney general stated, Ms. Brundige's testimony would contradict this testimony and show "he was not running toward the victim because the victim called him over. He was running toward the victim because he was shooting at the victim."

When defense counsel completed his cross-examination of Ms. Brundige, he requested a jury-out hearing. Counsel moved the trial court to strike Ms. Brundige's testimony, or in the alternative, grant a mistrial. Counsel contended Ms. Brundige's rebuttal testimony was improper pursuant to State v. West, 825 S.W.2d 695, 698 (Tenn. Crim. App. 1982). He argued Ms. Brundige's testimony should have been presented during the state's case-in-chief as opposed to presenting this testimony in rebuttal. The trial court denied the motion.

**B.**

The defendant asserts the trial court's refusal to grant his motion to strike, or in the alternative, for a mistrial, due to the state's introduction of an improper rebuttal witness constitutes reversible error pursuant to State v. West, 825 S.W.2d 695 (Tenn. Crim. App. 1992).

West is factually similar to the present case. In West, this Court held that rebuttal testimony is not proper if the witness was an eyewitness, provides the state's strongest evidence, and the witness should have been presented during the state's case-in-chief. West, 825 S.W.2d at 698. Additionally, this Court found that the failure to provide the defendant with notice of a rebuttal witness known to the prosecution before trial was not "within the context of the applicable norms of a level-handed prosecution" and was therefore prejudicial error. West, 825 S.W.2d at 698.

In this case, Ms. Brundige was an eyewitness to the shooting whose perspective as a passenger with an unobstructed view of the crime made her a potentially better witness than the driver, who testified for the state in its case-in-chief. The state was aware Ms. Brundige was a witness to the shooting prior to trial, yet no notice was provided to the defendant of her existence. The state also failed to notify the defendant that Ms. Brundige was outside the courtroom and available to testify throughout the course of the trial.

8

The state contends that Ms. Brundige was a proper rebuttal witness pursuant to State v. Sinclair, Madison County No. 02C01-9503-CC-00066, slip op. 11-12 (Tenn. Crim. App., Jackson, April 17, 1996), per. app. denied (Tenn. October 7, 1996). In Sinclair, an eyewitness testified as a rebuttal witness to contradict the defendant's claim of self-defense. The witness testified the victim was not wielding a knife prior to the shooting. Sinclair, slip op. at 11. This court refused to apply West because the rebuttal witness was "not called to recount eyewitness testimony; she was called directly to refute the Defendant's testimony." Sinclair, slip op. at 12. The court also noted prosecutors were not aware of the existence of the witness until the night before the witness was called to testify. Sinclair, slip op. at 12.

Although Ms. Brundige was an eyewitness to the shooting, her testimony did directly refute the testimony of the defendant. The state contends the testimony of Ms. Brundige refutes why the defendant was moving towards the victim. The state contends Ms. Brundige's testimony shows the defendant was moving towards the victim because he was shooting the victim, not because the victim called the defendant over. A stronger argument can be made that the testimony was proper rebuttal evidence because it contradicted the defendant's statements that he did not shoot the victim after he had fallen to the ground and that he was close enough to the victim to be pushed by him immediately prior to the shooting.

However, the state's reliance on Sinclair is misplaced because the state was aware Ms. Brundige was an eyewitness prior to trial. The state contends Sinclair applies because the prosecution was "not aware of the substance or value of the witness' testimony until the trial" since the state had no notice of the defendant's claim of self-defense until he testified. It is irrelevant that the state may not have been aware of the defendant's claim of self-defense in the present case because the defendant did not make a statement prior to trial. Sinclair does not address the failure of the state to fully understand the significance of a known eyewitness's testimony. Sinclair only provides for use of a rebuttal witness without notice to the defense when the state is unaware that the individual is an eyewitness prior to trial. In the present case, the state was aware prior to trial that Ms. Brundige was an eyewitness to the shooting. The burden of the state's failure to fully determine the

content of an eyewitness's testimony falls upon the state.

## C.

The phrase "rebuttal evidence" may be defined as evidence "which tends to explain or controvert evidence produced by an adverse party." Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1979). This phrase encompasses "[a]ny competent evidence which explains or is a direct reply to, or a contradiction of, material evidence introduced" by an adverse party. Nease v. State, 592 S.W.2d 327, 331 (Tenn. Crim. App.), per. app. denied (Tenn. 1979). Questions concerning the admission or rejection of rebuttal evidence rest within the sound discretion of the trial court; and an appellate court will not interfere with the exercise of this discretion unless it is clear on the face of the record that the trial court has abused its discretion. State v. Scott, 735 S.W.2d 825, 828 (Tenn. Crim. App.), per. app. denied (Tenn. 1987).

The testimony by Ms. Brundige was sufficiently contradictory to the defendant's testimony to constitute proper rebuttal testimony. However, the state should have called this witness during its case-in-chief. Moreover, by not providing notice to the defendant regarding the existence of Ms. Brundige as an eyewitness the state fell short of meeting "the applicable norms of a level-handed prosecution." West, 825 S.W.2d at 698.

The defendant had no prior notice of the substance of Ms. Brundige's testimony. The rebuttal testimony was not merely corrobative testimony; the testimony showed the defendant ran towards the victim after the initial shots were fired and that he continued to shoot the victim after he fell to the ground. Thus, the information given by the assistant district attorney general to defense counsel prior to trial was no longer valid. The assistant district attorney general had a duty to promptly disclose this newly acquired information to defense counsel rather than wait until Ms. Brundige was being called as a rebuttal witness.

Considering the record as a whole, allowing this testimony as rebuttal evidence and without prior notice to the defense of the eyewitness's existence constituted error involving a substantial right which may have affected the verdict of the jury or resulted in prejudice to the judicial process. Tenn. R. App. 36(b). It was therefore prejudicial error for the trial court to deny the defendant's motion to strike or for a mistrial.

_____

JOE B. JONES, PRESIDING JUDGE

CONCUR:

_____

WILLIAM M. BARKER, JUDGE

_____

THOMAS T. WOODALL, JUDGE